NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0625n.06

Nos. 09-3679, 09-3799

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Aug 26, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JOSE RODRIGUEZ; CARMEN RODRIGUEZ, | ) | |
| | ) | |
| Plaintiffs-Appellees (09-3679), | ) | |
| | ) | |
| KAREN PALMER, | ) | |
| | ) | |
| Plaintiff/Cross-Appellant (09-3799), | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| CITY OF CLEVELAND; RASCO DAVIS; GERALD | ) | |
| HALL; MICHAEL MCGRATH; ROBERT MILLER, | ) | |
| | ) | |
| Defendants-Appellants (09-3679); | ) | |
| Defendants/Cross-Appellees (09-3799). | ) | |
| | ) | |

BEFORE: NORRIS, ROGERS, WHITE, Circuit Judges.

**ROGERS, Circuit Judge.** After Plaintiff-Appellee Jose Rodriguez was acquitted on charges

of receiving stolen property and possession of criminal tools in state court, he brought this 42 U.S.C.

§ 1983 action against several police officers, the chief of police in his official capacity, and the City

of Cleveland. Rodriguez advances a number of constitutional claims premised on the search of his

place of business, seizure of business and personal property, and his two arrests in July 2006; his

subsequent state criminal proceedings; and the defendants' alleged retaliation for his filing of this

lawsuit. The district court denied the defendants qualified immunity as to all of Rodriguez's

constitutional claims, and the defendants now appeal that ruling. For the reasons that follow, we

reverse the district court's decision with respect to all of the claims on appeal, as the defendants are entitled to qualified immunity with respect to those claims.

Plaintiff Karen Palmer, who owned the towing business that Cleveland police officers searched—and from which they seized property—in July 2006, sued the same defendants as Rodriguez, alleging violations of her Fourth Amendment rights. The district court correctly granted summary judgment for defendants, on statute of limitations grounds, as to Palmer's constitutional claims.

## I. Facts

Because this denial of qualified immunity comes to us on interlocutory appeal, we must take the facts as assumed by the district court. *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). Our jurisdiction is limited to considering the legal issues raised. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005). The district court recounted the facts as follows:[1]

> Plaintiff Jose Rodriguez ("Rodriguez"), along with his wife, Carmen Rodriguez, has filed a *42 U.S.C. § 1983* lawsuit against Defendants City of Cleveland, former Lieutenant Robert Miller, Detectives Gerald Hall, Rasco Davis, and Brian Curry, Chief of Police Michael McGrath, and John Does 1-5. This suit arises out of the actions taken by the Defendants in July 2006 and thereafter. Plaintiff Karen Palmer, who sold or was in the process of selling certain property to Rodriguez that was allegedly subject to the Defendants' actions, is also a party to this case.[2]
> Plaintiff Rodriguez entered into a series of agreements in October 2004, December 2005, and January 2006 with Plaintiff Karen Palmer, the fiduciary of the

---

[1]Footnotes 2-15 are part of the district court's recitation of the facts.

[2]The *Rodriguez* and *Palmer* cases were consolidated for trial on February 11, 2009.

estate of Eugene Palmer.[3]   Under their agreements, Palmer was to transfer to Rodriguez the real estate, inventory, and equipment comprising M & M Auto Body and Towing ("M & M"), located at 7010 Harvard Avenue, Cleveland, Ohio.  Starting from January 2006, Rodriguez operated M & M and paid all of the expenses associated with the business.  The sale documents and lease agreement stated, however, that the completion of the sale of M & M and the other assets could take up to a year from the date that the documents were signed (January 21, 2006) or at least until December 31, 2006.  Further, according to the Plaintiffs, they had an understanding that Palmer had full ownership of the [sic] all of the assets included in the sale documents, including M & M itself, until Rodriguez finished paying for these assets.

On July 7, 2006, members of the Cleveland Police Department ("CPD")[4] arrived at M & M and arrested Plaintiff Rodriguez based solely upon information provided by an anonymous informant that Rodriguez had received stolen property and possessed criminal tools.  According to Defendant Hall, in the morning of July 7, 2006, he received a call at the CPD's Auto Theft Investigation Unit from "someone saying he had information about a stolen [white] dump truck [in the back corner of the side lot next to the M & M building] . . . . He [also] said the dump truck didn't run, and had been towed to M & M using an M & M tow truck."  This individual stated that he had been a former, long-time employee of M & M.  The informant did not leave his name or contact information; Hall gave the informant his cell phone number and told him to call if he had any other information.

Hall told Miller about the tip and, later in the day, Hall, Miller, and Detective Rasco Davis went to M & M to conduct a § 601.15 inspection.[5]  The officers did not

---

[3]Palmer entered into the following agreements with Rodriguez with respect to the sale of M & M: (1) Letter of Intent dated December 21, 2005; (2) Purchase Agreement dated January 21, 2006; (3) Asset Purchase Agreement dated January 21, 2006; and (4) Lease Agreement.

[4]Specifically, members of the CPD's Auto Theft Investigation Unit (the "Unit"), which consisted of Lieutenant Robert Miller (retired in September 2007), senior Detectives Joseph Ferenec and Gerald Hall, and Detective Rasco Davis.  According to Miller, Detective Brian Curry joined the Unit on July 31, 2006 and was therefore not involved in the Rodriguez matter.

[5]A 601.15 inspection is conducted pursuant to Cleveland Codified Ordinance § 601.15. This Ordinance states:

(a) For the purpose of locating stolen motor vehicles and/or stolen motor vehicle parts, the Chief of Police, or his authorized representative, may inspect any motor vehicle, as defined in *RC 4501.01* and may inspect any motor vehicle part that has

have a warrant. When the officers arrived at M & M, they told Plaintiff Rodriguez that they were there to do an inspection and he unlocked the gate to the lot and showed them the shop floor. The officers requested a zone car with uniformed CPD officers apparently to assist in running the VIN numbers of the vehicles. While Davis and Hall were outside inspecting vehicles, Hall saw a vehicle matching the description provided to him by the anonymous informant—a 2004 *Ford Carry-All with Vin # 1FDWF37P34EB32882*. According to Hall, this vehicle had cut marks in places where large equipment would normally be, including the plow and the hydraulic lift; the dump truck's steering column was also missing. The officers ran the vehicle's VIN number and discovered that it had been reported stolen from Medina in 2006. After Hall told Rodriguez that the vehicle had been reported stolen, a woman working at M & M allegedly provided them with a receipt for $ 2,200.00

---

been marked with an identifying number by the manufacturer, situated in the City of Cleveland in any public garage, community garage, storage garage, service garage, repair shop, parking lot, auto sales lot, vehicle leasing or rental lot, motor vehicle salvage facility, scrap metal processing facility, auto wrecking yard, junk yard, or other similar establishment, and may inspect the title, registration, vehicle identification number, or license plates of the vehicle in order to establish the rightful ownership or possession of the vehicle or vehicle part.

(b) For the purpose of locating a stolen vehicle, the Chief of Police, or his authorized representative, may inspect implements of husbandry and construction equipment in places described in division (a) of this section.

(c) Whenever possible, inspections conducted pursuant to division (a) or (b) of this section shall be conducted at a time and in a manner so as to minimize any interference with, or delay of, business operations.

(d) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance of a police officer from inspecting any place described in division (a), shall do any act which hampers or impedes a police officer from making an inspection pursuant to this Section.

Whoever violates this Section is guilty of obstructing vehicle inspections, a misdemeanor of the second degree.

of the $ 3,200.00 purchase price of the vehicle that was suspected of being stolen.[6] At this point, Hall arrested Rodriguez for being in possession of the stolen dump truck and criminal tools (tools that Hall believed had been used to disassemble the truck)[7] and requested that the truck be towed.

The stolen property charge alleged that, on July 7, 2006, Rodriguez "did receive, retain, or dispose of property of another, knowing and having reasonable cause to believe it had been obtained through commission of a theft offense, to wit: a 2004 Ford F-350 white on white dump truck with a *VIN # of 1FDWF37P34EB32882*."

In addition to the charge mentioned above, one count of the arrest warrant—issued on July 9, 2006—alleged that Plaintiff Rodriguez "did possess or have under his control any substance, device, instrument, or article, with purpose to use it criminally, to wit: ten ton floor jack, blue tool chest with tools, welding torch set on dolly." Another count alleged that Rodriguez, on July 7, 2006, "did possess or have under his control, any substance, device, instrument, or article with purpose to use it criminally, to wit: a 1995 Freightliner flatbed truck bearing Ohio License Plate No. PFA5423 and bearing the *VIN # of 1FV6GFAC6WH923275*." According to Rodriguez, the latter criminal allegation was never pursued.

While at M & M on July 7, 2006, Defendant Miller apparently noticed that the M & M tow trucks that were returning back to M & M along Harvard Avenue did not have proper markings on the side and did not have tow truck license plates on the bumpers in violation of Cleveland Codified Ordinance § 677A.10.[8] Miller instructed

---

[6]Hall states that this receipt, in the form of an M & M repair order, was handwritten, showed a date of 4/6/06, the name "Brian Miller," the phone number "440-521-4131," and "something about money paid and a balance owed on 4/5/06." Hall also states that the signature was illegible, there was no vehicle listed on the receipt, and that, following an investigation, he was unable to find any information on Brian Miller.

[7]While still at M & M after arresting Rodriguez on July 7, 2006, Hall indicates that he got a call on his cell phone from the anonymous informant, who told Hall that he was across the street from M & M and asked if Hall could see him. Hall states that he could not see the informant. The informant insisted that one of the M & M tow trucks had a stolen engine and Hall passed this information on to Miller. Based solely on this information, Hall subsequently got Miller's permission to check the VIN numbers of all of the engines in the M & M trucks.

[8]This Ordinance states:

Any person engaged in the business of offering towing services shall have imprinted

---

Defendant Davis to check each truck for violations of this Ordinance. According to Davis, none of the tow trucks he saw were licensed by the City of Cleveland or had the required license plates displayed on the bumper. After Davis conveyed this information to Miller, Miller authorized the impounding of these tow trucks.

On July 10, 2006, after being in jail for three days, Rodriguez appeared before a Cleveland Municipal Court judge, posted $15,000 for bail, and was released. Three days later, on July 13, 2006, Rodriguez states that Detective Miller requested that Rodriguez meet with him at M & M.[9] At that time, CPD officers "arrived with members of the television media who had been briefed on alleged criminal practices within the towing company business, and who then filmed as Plaintiff [Rodriguez] was arrested and escorted from [M & M], and collapsed, unconscious, on the ground."[10] The basis for Rodriguez's second arrest was the allegation that an engine in an M & M-owned vehicle that was confiscated from Rodriguez on July 7, 2006 was stolen.[11] While at M & M, the CPD confiscated M & M's remaining tow

---

on both sides of any vehicle used as a tow truck, slide or tilt-bed carrier, or car hauler, the name, address and telephone number of the person owning such vehicle. The name shall be printed in letters at least three inches high and not less than three-eighths of an inch wide, while the address, place and phone number shall be in letters two inches high and not less than three-eighths of an inch wide. Lettering shall be done in color which will contrast sharply with the background upon which it is painted and shall be placed in such position as to be easily seen by anyone wishing to identify the vehicle. Markings shall be kept clear and distinct at all times.

Anyone who violates this provision "shall be guilty of a misdemeanor of the second degree and shall be fined not more than seven hundred fifty dollars ($ 750.00) or imprisoned not more than ninety days, or both. Any such violation shall constitute a separate offense on each consecutive day continued."

[9]On July 13, 2006, Detective Hall was "processing M & M tow trucks," at the impound lot with Detectives Davis and Ferenec and other individuals who are not defendants in this case. Hall discovered that the engine in a tow truck with a VIN number ending in -13707 was apparently stolen. Hall called Detective Miller and informed him about the stolen engine and Miller authorized Hall to arrest Rodriguez. After the officers arrived at M & M, Hall arrested Rodriguez.

[10]The Defendants state that they did not notify the news media about the arrest.

[11]On July 14, 2006, Rodriguez's attorney, Edward La Rue, sent a letter to Miller informing him, in the interest of full cooperation, that "to truck # 400 . . . *may* have an engine of questionable

trucks,[12] because, according to Defendant Hall, they did not have the required City of Cleveland towing licenses on the bumpers, thereby permanently shutting down M & M.[13] Either Rodriguez or M & M held title to the confiscated trucks. In effect, the Defendants confiscated M & M's most important business assets, though these tow trucks were owned by M & M.

The Defendants' confiscation of M & M's tow trucks spelled disaster for M & M. Before the confiscation, AAA had a towing services contract with M & M. Following the confiscation, on July 14, 2006, AAA rescinded its towing contract with M & M due to M & M's failure to perform. Also on this date, Plaintiff Rodriguez's employer, Gibraltar Strip Steel, Inc. ("Gibraltar"), placed him on unpaid personal leave pending the disposition of the charges against him. Gibraltar ultimately terminated Rodriguez's employment on November 17, 2006.

Plaintiff Rodriguez was released from jail following his second arrest on July 14, 2006 without any criminal charges being filed against him. On this date, Defendant Davis issued summons for misdemeanor citations on nine of Rodriguez's tow trucks for violations of Ordinance § 677A.02. Rodriguez states that M & M's PUCO permit that he obtained on June 15, 2006 negated the need for local tow truck licenses.

On July 20, 2006, Plaintiff Rodriguez was indicted for criminal allegations arising out of his July 7, 2006 arrest; the case was assigned Cuyahoga County Criminal Case No. CR-483633. A "property seized" list attached to and incorporated within the indictment indicated that the allegedly stolen vehicle bore the VIN # 1FDAF56P04EA38188. The fact that Rodriguez owned and had title to this vehicle is undisputed. As a result, at trial, the State of Ohio amended the indictment, replacing this vehicle with the previously mentioned 2004 Ford dump truck bearing VIN # 1FDWF37P34EB32882. However, Cleveland never towed or confiscated this dump truck from M & M.

---

origin."

[12]A CPD inspection inventory list compiled on July 27, 2006 indicated that five tow truck vehicles were seized from M & M on July 7, 2006. These vehicles were never reported stolen and were titled to either M & M or Rodriguez. The list also revealed the fact that no vehicle fitting the description of the allegedly stolen 2004 Ford dump truck was ever confiscated from M & M.

[13]Miller authorized Hall to process these trucks for stolen parts during impoundment. On July 14, 2006, Hall apparently discovered that the engine of one of the trucks had its serial number ground off.

On November 2, 2006, Plaintiff Rodriguez was indicted for a second time for allegations arising out of his July 13, 2006 arrest; this case was assigned Cuyahoga County Criminal Case No. CR-487888. The list of property seized accompanying the indictment indicated that only one item had been seized from Rodriguez: a 2002 Ford F-450 Superduty tow truck, with VIN # 1FDAFS6F7YED33463. Rodriguez was also indicted in the second case for possession of criminal tools "to wit: engine parts" and other articles intended for use in the commission of a felony. At trial, Defendant Miller admitted that the indictment was incorrect and that the 2002 Ford tow truck was not stolen, although its engine was stolen. Through counsel, on August 28, 2006, Plaintiff Rodriguez requested the return of all vehicles not subject to criminal allegations. A Cuyahoga County Court of Common Pleas judge granted this motion on August 29, 2009 [sic], although Rodriguez's property and vehicles were apparently not returned to him until February 27, 2007.[14]

On September 10, 2006, Plaintiff Rodriguez and Plaintiff Palmer executed a Termination and Mutual Release Agreement resulting in the cancellation of the other agreements concerning the sale, lease, and purchase of M & M and its assets. Palmer entered into this agreement after apparently learning of Rodriguez's arrests and the seizure of M & M's assets from the news media,[15] because she understood that Rodriguez would be unable to satisfy his contractual obligations, including continuing to pay rent and complete the purchase of M & M, and because she wanted to get M & M's assets back into her possession.

On January 30, 2007, after several days of trial, the presiding Cuyahoga County Common Pleas Judge dismissed the felony charges against Plaintiff Rodriguez pursuant to *Ohio Rule of Criminal Procedure 29*. The Judge also ordered that all property belonging to M & M and Rodriguez be immediately returned to Rodriguez. According to Plaintiff Palmer, after the assets were eventually released,

---

[14]The Defendants allege that Rodriguez could have regained possession of the tow trucks pursuant to Cleveland Codified Ordinance § 405.05 if he (1) paid a nominal towing charge and storage fee and any outstanding fines in connection with the violation; (2) posted a bond, whereupon the vehicles would be released, on the condition that he would appear in municipal court to answer the violation; or (3) requested a probable cause hearing for the following business day, whereupon the vehicles would be released upon a finding of no probable cause. According to the Defendants, Rodriguez did not take any of these actions. This Ordinance does not pertain to vehicles towed from private property, however.

[15]According to Palmer, no one from the CPD ever contacted her to investigate whether she owned any of the property that the CPD had seized from M & M or to ask about her contractual relationship with Rodriguez.

she liquidated them to the best of her ability, although she had to sell them for a
lower price than that originally offered by Rodriguez.

*Rodriguez v. City of Cleveland*, 619 F. Supp. 2d 461, 468-472 (N.D. Ohio 2009) (citations omitted)
(footnotes in original).

## II. Proceedings below

### A. Rodriguez's civil rights action

On July 1, 2008, Rodriguez filed a complaint against the City of Cleveland, Lieutenant
Miller, Detectives Hall and Davis, and other named defendants, in the Court of Common Pleas for
Cuyahoga County, Ohio, alleging, among other 42 U.S.C. § 1983 claims, illegal search and seizure,
malicious prosecution and continued unlawful detention, and municipal liability for failure to train.
Rodriguez also brought a number of state-law claims.

In August 2008, the defendants removed the action to federal district court. In April 2009,
the district court granted Rodriguez leave to file a Third Amended Complaint—the complaint at the
heart of this appeal. In that complaint, Rodriguez asserted the following claims: (1) Count I:
unreasonable searches and seizures of person and property, in violation of the Fourth Amendment;
(2) Count II: failure to intercede/intervene; (3) Count III: conscience-shocking and outrageous
conduct, in violation of the Fourteenth Amendment; (4) Count IV: false arrest and false
imprisonment, in violation of the Fourth Amendment; (5) Count V: intentional omission of
exculpatory information to secure indictments, in violation of the Fourteenth Amendment Due
Process Clause; (6) Count VI: absence of qualified immunity and good faith; (7) Count VII:
municipal liability for failure to train and supervise police officers in the proper execution of an

administrative inspection; (8) Count VIII: municipal liability for failure to investigate and discipline police officers/ratification of illegal actions; (9) Count IX: retaliation and harassment, in violation of the First Amendment; (10) Count X: malicious prosecution and continued unlawful detention without probable cause, in violation of the Fourth Amendment; (11) Count XI: supervisory liability for Fourth Amendment violations; and various state-law claims.

Following preliminary discovery, Rodriguez moved for summary judgment on his claim for unreasonable seizure of property in violation of the Fourth Amendment. Rodriguez asserted that the state trial court judge who had dismissed the felony charges against him had "rul[ed] that the arrests carried out by CPD officers were without probable cause as was their seizure of Rodriguez's personal and business property in July, 2006." As to whether reasonable suspicion (as opposed to probable cause) justified the defendants' seizure and continued detention of his property, Rodriguez contended that the "seizure and extended detention of [his] property from M & M, which ultimately lasted until February 27, 2007, based solely upon an 'anonymous tip' about one unrelated vehicle (the white dump truck) not involved in M & M business, was unreasonable in duration as a matter of law and well established police regulations." Rodriguez concluded that "[i]n the absence of a legitimate administrative inspection and/or probable cause, the CPD detectives needed a warrant to search M & M, and they had no basis to seize any of the nine (9) tow truck vehicles and tools in July, 2006."

The defendants jointly opposed Rodriguez's motion for summary judgment, contending that Rodriguez's motion was "premised entirely on mischaracterizations of fact, mischaracterizations as

to the basis for impounding certain vehicles used by M & M, and mischaracterizations regarding the underlying criminal case." According to the defendants, "[t]he undisputed facts establish a constitutionally sound basis for taking each of these items such that Rodriguez suffered no Fourth Amendment violation."

After Rodriguez moved for summary judgment on his seizure of property claim, the defendants jointly moved for summary judgment on the ground that "[t]here is no genuine issue of material fact to refute that none of the Defendants violated any of the Plaintiffs' federally protected civil rights, and the individual Defendants are entitled to qualified immunity."[16] More specifically, the defendants contended that they had developed "probable cause to arrest Jose Rodriguez, and there was no violation of his Fourth Amendment rights." Moreover, the defendants maintained that they had "impounded Rodriguez's vehicles pursuant to a facially valid City ordinance that provided an adequate post-deprivation remedy, and, therefore, resulted in no Fourth Amendment violation."

Rodriguez opposed the defendants' joint motion for summary judgment. He argued that the individual defendants had "used warrantless searches and seizures under the pretext of an administrative C.C.O. § 601.15 inspection;" indeed, in initiating the search of M & M, the individual defendants' "primary stated objective was to search and gather evidence of a stolen dump truck." Rodriguez also maintained that he had been "both unlawfully arrested and detained by CPD

---

[16]Although the defendants filed their joint motion for summary judgment before Rodriguez had officially filed his Third Amended Complaint, the district court denied the defendants' joint motion to file a revised motion for summary judgment in response to Rodriguez's filing of the Third Amended Complaint.

detectives on two (2) separate occasions without a warrant, court order or probable cause." In support of this contention, Rodriguez asserted that, "[g]iven the M & M receipt hand delivered to defendant Hall on July 7, 2006, there is ample evidence in the record that the CPD detectives, as Rodriguez's accusers, had no probable cause to believe that he was actually guilty of 'receiving stolen property' or in 'possession of criminal tools' because they had no witnesses to the alleged crimes, and they did not observe any of the alleged crimes."

The district court denied qualified immunity as to all of Rodriguez's federal constitutional claims and granted Rodriguez's motion for summary judgment as to his seizure of property claim. In finding that the individual defendants lacked probable cause to seize Rodriguez's property, the district court relied upon its perception that the state trial court judge dismissed the felony charges against Rodriguez on the basis of just such a finding.[17] *Rodriguez*, 619 F. Supp. 2d at 477. Moreover, from the district court's perspective, there was no evidence to suggest that Rodriguez "had cause to believe that the stolen truck in question had been obtained through a theft offense." *Id.* at 477-78. And, although the defendants claimed that they had impounded M & M's tow trucks

_____

[17]The record instead appears to show that the state trial court judge granted Rodriguez's motion for judgment of acquittal because the state had not presented sufficient evidence to convict him on any of the charges against him. Indeed, Ohio Rule of Criminal Procedure 29(A) provides that a state trial court, "on motion of a defendant . . . after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, *if the evidence is insufficient to sustain a conviction* of such offense or offenses." (Emphasis added.) It does not appear that the state trial court judge, in granting Rodriguez's Rule 29 motion, addressed the issue of probable cause at all.

pursuant to C.C.O. § 677A, the district court concluded that C.C.O. § 677A "does not authorize the towing of vehicles." *Id.* at 478.

Furthermore, the district court found that the defendants could not resort to reasonable suspicion (as opposed to probable cause) as a justification for their detention of Rodriguez's property because the anonymous tip about the stolen dump truck had lacked sufficient indicia of reliability. *Id.* Even if the anonymous tip had been reliable, however, and had "provid[ed] reasonable suspicion for the temporary detention of the allegedly stolen dump truck," the district court held that "the seizure of all the remaining M & M vehicles was certainly not the least intrusive means of conducting the investigation in this case; neither was the detention of all of those vehicles for approximately seven months and for nearly a month following the dismissal of the claims against [Rodriguez]." *Id.*

Nor could the defendants seek shelter under the administrative inspection exception to the Fourth Amendment's warrant requirement, according to the district court, because an "administrative inspection may not be used to gather evidence as part of what is, in actuality, a criminal investigation." *Id.* at 479 (citing *New York v. Burger*, 582 U.S. 691, 716 n.27 (1987)). The district court concluded that "[b]ecause the Defendants should have obtained a search warrant prior to conducting this type of inspection, and because they had neither probable cause nor reasonable suspicion to seize and subsequently retain the M & M tow trucks, the seizure of the tow trucks violates the Fourth Amendment." *Id.* Adding insult to constitutional injury, after the defendants had arrested Rodriguez and "seiz[ed] half of his property on July 7, 2006," the defendants had "c[o]me

- 13 -

back a week later, again without a warrant, and arrested the Plaintiff again, while seizing the remainder of his property." *Id.*

Having found a violation of Rodriguez's Fourth Amendment rights, the district court determined that "[t]he requirement that government officials must obtain a search warrant before making an unwelcome intrusion onto private property has been clearly established law for over 20 years." *Id.* Furthermore, "the notion that either probable cause or reasonable suspicion (depending on the circumstances of the search) is required for a constitutional seizure of persons or property has been clearly established law for over 20 years." *Id.* at 480. Accordingly, the defendants' violation of Rodriguez's Fourth Amendment rights "was objectively unreasonable." *Id.* The district court, therefore, denied qualified immunity. *Id.* Because there were "no genuine issue[s] of material fact with respect to [Rodriguez's] claim of a Fourth Amendment violation based on an unreasonable search and seizure," the district court granted summary judgment in Rodriguez's favor. *Id.*

With respect to defendants' motion for summary judgment on Rodriguez's claims premised on failures to investigate, train, and supervise, the district court denied qualified immunity because "genuine issues of material fact remain[] that must be resolved at trial." *Id.* at 481-82. The district court similarly denied defendants summary judgment on Rodriguez's First Amendment retaliation and harassment claim on the ground that genuine issues of material fact remain "regarding the involvement of the Defendants" in the allegedly retaliatory incidents and because "[t]he defense of qualified immunity has generally been rejected by the courts in conjunction with retaliation claims." *Id.* at 483-84. The district court determined that Rodriguez's claim of malicious prosecution and

unlawful detention without probable cause required the same analysis as Rodriguez's claim premised on the intentional omission of exculpatory evidence to secure indictments. *Id.* at 484 n.21. The district court denied qualified immunity as to both claims because "there exist genuine issues of material fact about whether some or all of the Defendants withheld exculpatory information in order to indict Plaintiff Rodriguez, arrest him, and seize (and continue the detention of) his property." *Id.* at 484.

Defendants now appeal, asserting that they are entitled to qualified immunity.

**B. Palmer's civil rights action**

On October 14, 2008, Palmer filed a complaint against the City of Cleveland, Lieutenant Miller, Detectives Hall and Davis, and other named defendants in federal district court. In her Amended Complaint, Palmer states claims for (1) Count I: malicious prosecution and illegal attachment; and (2) Count II: unreasonable search and seizure in violation of the Fourth Amendment.

In April 2009, Palmer moved for summary judgment on her Fourth Amendment seizure of property claim. The defendants opposed her motion for summary judgment and also filed a separate motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). In this motion, the defendants argued, in relevant part, that "Palmer's claims under Section 1983 are all time-barred by Ohio's two-year statute of limitations for claims brought under Section 1983."

The district court granted summary judgment for defendants on both of Palmer's claims, finding them both barred by the statute of limitations. *Rodriguez*, 619 F. Supp. 2d at 480-81. Palmer subsequently sought, and the district court granted, a Federal Rule of Civil Procedure 54(b)

certification. The district court concluded that there was "no just reason for delay[ing]' Palmer's appeal" of the grant of summary judgment. Palmer now appeals.

Because this is an appeal from the district court's denial of qualified immunity, with more proceedings to follow, our jurisdiction is limited to the consideration of issues of law. *See McKenna v. City of Royal Oak*, 469 F.3d 559, 561 (6th Cir. 2006). Indeed, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319-20.

**III. Search of M & M did not violate Rodriguez's rights under the Fourth Amendment**

Qualified immunity is warranted under Count I, because the individual defendants did not violate Rodriguez's Fourth Amendment rights when they searched M & M pursuant to C.C.O. § 601.15. This is so even though the defendants had received an anonymous tip about a stolen dump truck on M & M's lot. State actors sued under 42 U.S.C. § 1983 are generally afforded qualified immunity, which means that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). Qualified immunity applies if, "considering the allegations in a light most favorable to the party injured, a constitutional right has [not] been violated." *Estate of Carter*, 408 F.3d at 310 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). That is the case here.

Pursuant to C.C.O. § 601.15, the individual defendants had the authority to search M & M's lot.

That ordinance provides,

> For the purpose of locating stolen motor vehicles and/or stolen motor vehicle parts, the Chief of Police, or his authorized representative, may inspect any motor vehicle, as defined in RC 4501.01 and may inspect any motor vehicle part that has been marked with an identifying number by the manufacturer, situated in the City of Cleveland in any . . . service garage, repair shop, . . . auto sales lot, vehicle leasing or rental lot, motor vehicle salvage facility, scrap metal processing facility, auto wrecking yard, junk yard, or other similar establishment, and may inspect the title, registration, vehicle identification number, or license plates of the vehicle in order to establish the rightful ownership or possession of the vehicle or vehicle part.

C.C.O. § 601.15(a).  Rodriguez does not appear to challenge the facial constitutionality of this ordinance, which provides for warrantless administrative inspections of businesses in the automotive and salvage industries.  Indeed, both this court and the Ohio Court of Appeals have upheld C.C.O. § 601.15 against facial constitutional challenges.  *Term Auto Sales, Inc. v. City of Cleveland*, 54 F.3d 777, 1995 WL 308988, at *2-5 (6th Cir. May 18, 1995) (per curiam); *State v. Grays*, No. 82410, 2003 WL 22972240, at *2-4 (Ohio Ct. App. Dec. 18, 2003); *see also State v. Zinmeister*, 501 N.E.2d 59, 63-65 (Ohio Ct. App. 1985) (upholding, against facial constitutional challenge, predecessor to current version of C.C.O. § 601.15).  Furthermore, the Supreme Court upheld a similar New York statute against Fourth Amendment challenge in *New York v. Burger*, 482 U.S. 691, 708-18 (1987).

The individual defendants' pre-search suspicion that Rodriguez possessed a stolen dump truck did not render their warrantless administrative search of M & M invalid.  This conclusion finds support in *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983), where the Supreme Court concluded that customs officers had not offended the Fourth Amendment when, pursuant to a federal

statute, those officers boarded a sailboat in a shipping channel and asked to see the sailboat's

documentation. *Id.* at 580-83, 592-93. While onboard the sailboat and examining its documentation,

one of the customs officers detected an odor of burning marijuana; "[l]ooking through an open hatch,

[that officer] observed burlap-wrapped bales that proved to be marijuana." *Id.* at 583. The officers

subsequently discovered that more than 5800 pounds of marijuana had been stashed "in almost every

conceivable place" on board the sailboat. *Id.* The boat's passengers were ultimately convicted of

several charges related to the importation and possession with the intent to distribute of marijuana.

*Id.* at 583. On appeal to the Supreme Court, "[t]he only question presented . . . concern[ed] the

validity of the suspicionless boarding of the vessel for a document inspection." *Id.* at 584 n.3. The

Court rejected, in a footnote, the passengers' contention that, because the customs officers "were

accompanied by a Louisiana State Policeman, and were following an informant's tip that a vessel

in the ship channel was thought to be carrying marijuana, they may not rely on the statute authorizing

boarding for inspection of the vessel's documentation." *Id.* The Court explained that its acceptance

of such an argument "would lead to [an] incongruous result," *id.*; indeed, the Court saw "little logic

in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of

suspected smugglers," *id.* (quoting *United States v. Arra*, 630 F.2d 836, 846 (1st Cir. 1980)); *see also*

*Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state

of mind which is hypothecated by the reasons which provide the legal justification for the officer's

action does not invalidate the action taken as long as the circumstances, viewed objectively, justify

that action.")

In cases more factually analogous to this one, other federal circuits have concluded that an

officer's suspicion as to the presence of a stolen vehicle did not render unconstitutional the initiation

of a warrantless administrative inspection of an automotive repair- or salvage-related business. For

example, in *Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007), an Auto Theft Unit officer had received

a complaint from an individual who had allegedly purchased a vehicle with a suspicious VIN from

a particular auto body repair shop and salvage yard. *Id.* at 1235-36. After receiving this complaint,

the officer and his supervisor set out to search the repair shop/salvage yard pursuant to a Florida

statute that "permits a warrantless physical inspection of" such businesses "during normal business

hours 'for the purpose of locating stolen vehicles.'" *Id.* at 1236 (quoting Fla. Stat. § 812.055). In

a subsequent civil rights action, the owner of the repair shop/salvage yard asserted that, "from the

inception, the search of the [business] was not a routine administrative inspection, but rather an

ordinary criminal raid, undertaken with suspicion of a particular crime and implemented to discover

and seize evidence of that crime." *Id.* at 1240. Although the Eleventh Circuit recognized "that the

administrative search exception [should] not be allowed to swallow whole the Fourth Amendment,"

*id.* at 1241, that court concluded that the inception of the warrantless administrative inspection at

issue nonetheless passed constitutional muster, *id.* at 1242.[18] Noting that "[t]he Supreme Court has

---

[18]Though that court found the search of the repair shop/salvage yard acceptable in its
inception, the Eleventh Circuit held that there was a genuine issue of material fact as to whether the
search was unreasonable in its execution. *Bruce*, 498 F.3d at 1248. The court noted that
"administrative searches are an exception to the Fourth Amendment's warrant requirement, but they
are not an exception to the Fourth Amendment's requirement for reasonableness." *Id.* at 1243 (citing
*Donovan v. Dewey*, 452 U.S. 594, 598-99 (1981)). Still, the search in that case was "conducted by
20 officers over a period of eight hours" and involved a SWAT-like invasion of the premises with

made quite clear that an administrative search is not rendered invalid because it is accompanied by *some suspicion* of wrongdoing," the Eleventh Circuit determined that the complaint the officers had received did not generate the probable cause necessary to support an application for a search warrant. *Id.* Lacking "direct criminal suspicion of wrongdoing," the officers had "validly invoked their statutory authority to" search the repair shop/salvage yard. *Id.*

Under similar circumstances, the Fifth Circuit also upheld an administrative search. In *United States v. Thomas*, 973 F.2d 1152 (5th Cir. 1992), a state agent had tracked a particular salvage vehicle to a particular salvage yard and had then conducted a warrantless administrative inspection of that salvage yard pursuant to a state statute. *Id.* at 1155. The proprietor of the salvage yard, who had been convicted of several counts of falsifying vehicle identification numbers and of trafficking in motor vehicles with such falsified numbers, challenged the constitutionality of the warrantless administrative inspection on appeal. *Id.* In response to the proprietor's challenge, the Fifth Circuit held that "[a]dministrative searches conducted pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing." *Id.* at 1155-56; *see also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 198 n.7 (5th Cir. 2009) (noting that an "administrative search cannot be pretextual," but "[a]n officer's suspicions about criminal wrongdoing do not . . . render an administrative inspection pretextual").

---

the search and detention of employees, making it much more invasive than the search at issue in this case. *Id.* at 1244.

The Tenth Circuit has similarly held that where officers "lacked probable cause to think that any specific criminal conduct had occurred," but "had a vague suspicion that the kind of criminal activity the administrative scheme was directed towards detecting—car theft—had occurred or might be evident at [a particular] salvage yard . . . [t]here [was] nothing unconstitutional in embarking upon an administrative inspection with that degree of criminal suspicion." *United States v. Johnson*, 408 F.3d 1313, 1321 (10th Cir. 2005). At the same time, the Tenth Circuit "cautioned, however, that the evidence of criminal activity cannot be so compelling that police have, in essence, probable cause to believe that specific criminal conduct has occurred." *Id.* Rodriguez himself maintains that the anonymous tip about the stolen dump truck did not provide the individual defendants with probable cause, or even reasonable suspicion, to justify a search of M & M's premises. Even though the individual defendants suspected wrongdoing before they searched M & M, that suspicion did not render their warrantless administrative inspection pretextual, and thus, invalid. The individual defendants' initiation of the search at M & M, therefore, did not violate the Fourth Amendment.

The situation in *Jacob v. Township of West Bloomfield*, 531 F.3d 385 (6th Cir. 2008), relied upon by the district court, was very different. The district court cited *Jacob* to support the contention that "when officials target a particular individual for an inspection and when that inspection carries 'with it the very real threat of criminal sanctions,' . . . the inspection is criminal in nature—necessitating a warrant—and not administrative." *Rodriguez*, 619 F. Supp. 2d at 479. However, the *Jacob* case involved entry by a land ordinance enforcement officer onto the curtilage of the plaintiff's residential property to inspect the area for violations of a local land use ordinance

that the plaintiff had violated multiple times in the past. *Jacob*, 531 F.3d at 387-88. In *Jacob*, this

court recognized the high expectation of privacy in the curtilage of a person's home, and "considered

[the] distinction between criminal and merely administrative investigations." *Id.* at 389-90 (citing

*Widgren v. Maple Grove Twp.*, 429 F.3d 575 (6th Cir. 2005)). This case, in contrast, involves the

search of the business premises of a closely-regulated industry. Further, the ordinance at issue falls

within the acceptable overlap between administrative schemes and penal laws. *See Burger*, 482 U.S.

at 712-13 (stating that "a State can address a major social problem *both* by way of an administrative

scheme *and* through penal sanctions," and that "an administrative scheme may have the same

ultimate purpose as penal laws, even if its regulatory goals are narrower," when considering a search

pursuant to a similar provision permitting searches of junkyard businesses). Accordingly, the

individual defendants' administrative search fell within the confines of the Fourth Amendment,

which entitles them to qualified immunity as to this claim.

**IV. Seizure of property did not violate Rodriguez's rights under the Fourth Amendment**

The individual defendants did not violate Rodriguez's clearly established Fourth Amendment

rights by the seizure without probable cause of tow trucks that had not been stolen.[19] Qualified

immunity is warranted even if a constitutional violation has occurred if the right violated was not

---

[19]We need not address the stolen dump truck nor the seizure of various tools. The district court found, on the basis of Rodriguez's evidence, that the individual defendants never towed or confiscated the stolen dump truck from M & M. *See Rodriguez*, 619 F. Supp. 2d at 471. Moreover, on appeal, Rodriguez does not appear to address the constitutionality of the seizure of his various tools, e.g., the ten-ton floor jack, the blue tool chest, etc., which defendants contend were contraband or evidence of crime.

clearly established, *Estate of Carter*, 408 F.3d at 310 (citing *Saucier*, 533 U.S. at 201), and we may proceed directly to that inquiry in appropriate cases. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)). Assuming, without necessarily deciding, that the seizure of the tow trucks violated Rodriguez's Fourth Amendment rights, the individual defendants are entitled to qualified immunity nonetheless because there was a reasonable basis to believe that they had the authority to impound Rodriguez's tow trucks for violations of local licensing laws. While lawfully on M & M's premises to conduct a warrantless administrative inspection, Lieutenant Miller apparently noticed that the tow trucks returning to M & M along Harvard Avenue lacked external identification markings in violation of C.C.O. § 677A.10; nor did the tow trucks have the proper license tags on their bumpers, a violation of C.C.O. § 677A.04. Detective Davis apparently confirmed for Lieutenant Miller that none of the tow trucks returning to M & M were licensed by the City of Cleveland—a violation of C.C.O. § 677A.02(a). And, in fact, Rodriguez conceded during his deposition testimony that M & M's tow trucks were never licensed by the City of Cleveland. Pursuant to C.C.O. § 677A.99, any of these violations of Chapter 677A is a second-degree misdemeanor.

The individual defendants contend that they impounded the tow trucks because of these various violations, and pursuant to C.C.O. § 405.02, which authorizes the impounding of vehicles

under a number of circumstances including: "[w]hen any vehicle is parked on any street or other

public property and displays illegal plates or fails to display the currently lawfully required license

plates," or "[w]hen any vehicle has been operated by any person who is driving without a lawful

license or while his license has been suspended or revoked." C.C.O. § 405.02(d), (i). Published

Ohio cases have apparently not applied or construed this ordinance; therefore, it cannot be said that

a limited interpretation of the ordinance has been clearly established. Moreover, Rodriguez does not

contest that C.C.O. § 405.02 is a facially valid ordinance, and this court's decision in *Wolfel v.*

*Morris*, 972 F.2d 712 (6th Cir. 1992), supports the conclusion that the individual defendants are

entitled to qualified immunity because they reasonably relied on a facially valid local ordinance.[20]

Although it is not clear that the M & M tow trucks were "parked," as that term is defined by local

ordinance or that all (or any) of the vehicles were being operated by persons driving without valid

personal licenses, when Lieutenant Miller noticed that these tow trucks lacked the proper license

tags, the individual defendants could still have reasonably understood C.C.O. § 405.02 as authorizing

the impoundment of M & M's tow trucks. Significantly, both subsections give officers the ability

to impound vehicles because of licensing violations. Accordingly, there was a reasonable basis for

---

[20]*Wolfel* involved prison guards' seizure as contraband of signature pages for petitions circulated among prison inmates, which the guards believed violated a facially valid state regulation. *Wolfel*, 972 F.2d at 714. Though this court found the regulation to be unconstitutionally vague as applied to these plaintiffs, we held that the prison officials were entitled to qualified immunity for their actions. *Id.* at 719. The prison guards' "interpretation of that regulation to cover the events at issue was . . . in error," but this court could not "say that no reasonable official . . . could not have thought that the regulation provided sufficient notice that the prisoners' actions were punishable." *Id.* Thus, the prison officials had "reasonably relied on and applied valid regulations," and were "entitled to qualified immunity for their actions." *Id.* at 720.

the defendants to believe that they had the authority, under this ordinance, to impound Rodriguez's

tow trucks, whether or not that belief was actually correct under a strict interpretation C.C.O. §

405.02.

Rodriguez contends that, because he complied with state licensing requirements, he was not

obligated to comply with the City of Cleveland's licensing requirements, and that the individual

defendants, therefore, lacked the authority to impound his tow trucks. But that is not clearly the case.

Rodriguez cites *City of Cleveland v. Fox*, 761 N.E.2d 126 (Ohio Ct. App. 2001), as support for his

contention. In *Fox*, the Ohio Court of Appeals reversed a tow truck driver's conviction for violating

C.C.O. § 677A.14, which requires that "[e]very person driving a tow truck shall be licensed." *Id.*

at 126, 129 (alteration in original). The Ohio Court of Appeals concluded that 49 U.S.C.

§ 14501(c)(1)[21] preempted all local regulation of towing companies. *Id.* at 128. Moreover, the court

of appeals held that none of the statutory exceptions to that general preemption provision applied to

save Cleveland's licensing requirements from preemption—although § 14501(c)(2)(A)[22] reserved

the power of promulgating safety regulations for the states, that exception did not extend to the

---

[21]49 U.S.C. § 14501(c)(1) states,

Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

[22]Pursuant to 49 U.S.C. § 14501(c)(2)(A), the general preemption provision in § 14501(c)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles."

states' political subdivisions. *Id.* Finding Cleveland's licensing requirements preempted, the Ohio Court of Appeals declined to decide whether C.C.O. § 677A.14 "constitute[d] safety regulations that would fall within [§] 14501(c)(2)(A)'s exception to preemption." *Id.*

Approximately one year after the Ohio Court of Appeals' decision in *Fox*, however, the United States Supreme Court effectively overruled that decision. In *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424 (2002), the Supreme Court held "that § 14501(c) does *not* bar a State from delegating to municipalities and other local units the State's authority to establish safety regulations governing motor carriers of property, including tow trucks." *Id.* at 428. (emphasis added). The Supreme Court "express[ed] no opinion," though, as to whether the City of Columbus's regulation of tow truck companies, at issue in *Ours Garage*, "in whole or in part, qualif[ied] as [an] exercise[] of 'safety regulatory authority' or otherwise f[e]ll within § 14501(c)(2)(A)'s compass." *Id.* at 442. It appears that neither the Supreme Court, this court, nor any Ohio court has since decided whether local tow truck licensing requirements "qualify as exercises of 'safety regulatory authority'" such that § 14501(c)(2)(A)'s exception to federal preemption applies. Nor do we need to decide this issue today; the mere fact that it has not been settled is sufficient to resolve the qualified immunity issue in this appeal. Thus, Cleveland's tow truck licensing requirements are not clearly preempted by federal law.

It is less clear, however, whether Cleveland's requirements are preempted by Ohio law. Section 4921.30 of the Ohio Revised Code states,

> Any person, firm, copartnership, voluntary association, joint-stock association, company, or corporation, wherever organized or incorporated, that is engaged in the

> towing of motor vehicles is subject to regulation by the public utilities commission as a for-hire motor carrier under this chapter. Such an entity is not subject to any ordinance, rule, or resolution of a municipal corporation, county, or township that provides for the licensing, registering, or regulation of entities that tow motor vehicles.

This provision went into effect on March 31, 2003—well before the incidents at issue in this case. However, the City of Cleveland apparently "maintains that Ohio's attempt to preempt cities in this area is unconstitutional under the Home Rule doctrine of the Ohio Constitution, and [Cleveland] continues to enforce its tow truck regulations." In March 2009, the City of Cleveland filed a declaratory judgment action in the Court of Common Pleas for Cuyahoga County, Ohio, seeking to clarify whether Ohio Rev. Code § 4921.30 does, in fact, infringe upon Cleveland's Home Rule authority. It appears that no state court has yet ruled on this issue.

Because it is not clear whether Cleveland's tow truck licensing requirements are preempted by federal or state law, and because those requirements were apparently still on the books in July 2006, it was not objectively unreasonable for the individual defendants in this case to enforce those requirements by impounding the tow trucks. *See Wolfel*, 972 F.2d at 719; *cf. Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979) (concluding, in a different context, that " [a] prudent officer . . . should not have been required to anticipate that a court would later hold the ordinance unconstitutional"). Accordingly, the individual defendants are entitled to qualified immunity for their actions in impounding M & M's tow trucks.

Rodriguez also asserts that the continued detention of his property, after its initial seizure, violates the Fourth Amendment, but this also is not clearly the case. The citations Detective Davis

issued on July 14, 2006, for violations of C.C.O. § 677A.02, ordered Rodriguez to appear at the

Cleveland Municipal Court on July 28, 2006. At some point, those charges were dismissed, but the

date of dismissal is not entirely clear from the record. In his affidavit, Rodriguez asserts that, on July

26, 2006, his "criminal defense counsel, by certified letter, made a demand to [Lieutenant Miller]

for the return of all vehicles not subject to criminal allegations." But, according to that affidavit, "all

of the vehicles not subject to any criminal allegations continued to be held in the physical custody

of the City of Cleveland until August 27, 2006[,] and thereafter." This statement, however, makes

the questionable suggestion that the impounded vehicles were not subject to any criminal allegations,

but we have already determined that they were impounded according to local ordinance because they

lacked the required markings. On August 28, 2006, Rodriguez's counsel moved the Court of

Common Pleas for Cuyahoga County, Ohio, for an order releasing the tow trucks. Although the state

court granted Rodriguez's motion on August 29, 2006, the state court subsequently set aside that

order and required the re-seizure of the tow trucks.[23] By September 10, 2006, Rodriguez and Palmer

had rescinded their earlier agreements for the sale of M & M. Thus, Rodriguez no longer had a

possessory interest in the vehicles after that date and cannot claim a violation of his rights in the

property's detention after September 10, 2006.

---

[23]According to the docket from the criminal case against Rodriguez, his emergency motion for the return of personal property was granted on August 29, 2006. However, on September 7, 2006, the court vacated and set aside that order pending consideration of the State's motion for reconsideration of the August 29 motion. Accordingly, the tow trucks continued to be held pursuant to court order past the date of rescission of the contract for the sale of M & M. Rodriguez does not dispute the enforceability of these court orders, but instead suggests that the defendants kept his property in violation of said orders. This, however, appears not to be the case.

Assuming the tow trucks continued to be held, because of the aforementioned licensing violations, at least until the rescission of the contract for the sale of M & M, the defendants were entitled to qualified immunity with respect to their refusal to release them.[24]  Pursuant to C.C.O. § 405.05, the owner of a lawfully impounded vehicle has the following three options:

> (1) The owner . . . shall pay a towing charge of twenty-five dollars ($25.00) for an ordinary tow or thirty-five dollars ($35.00) for a dolly tow, all outstanding fines for violating provisions of this Traffic Code, and a storage fee of three dollars ($3.00) for each day or part thereof the vehicle is impounded after the first twenty-four hours. Upon such payment, the vehicle shall be released.

> (2) The owner . . . shall furnish a bond in an amount as set by rule of the Municipal Court.  Such bond shall be upon the condition that such owner or other person appear in the Municipal Court to answer the violation which caused the vehicle to be impounded.  The date for such appearance shall be scheduled when the bond is posted.  Upon the posting of such bond, the vehicle shall be released.

> (3) The owner . . . shall request a probable cause hearing.  The hearing shall take place on the day after such owner or other person is given written notice to the Cleveland Police Division Vehicle Impound Unit of his intention to challenge the towing. If, however, such day is a Saturday, Sunday or legal holiday, the hearing will be held on the next day which is not a Saturday, Sunday or legal holiday.

Rodriguez, however, did not exercise any of these options.  Instead, Rodriguez admits only that his "criminal defense lawyer, by certified letter, made a demand to defendant Miller for the return of all vehicles not subject to criminal allegations forthwith."  Rodriguez appears to assume that the

---

[24]No evidence in the record conclusively establishes when these licensing charges were dismissed.  The plaintiff bears the ultimate burden of proof in showing that the defendant is not entitled to qualified immunity.  *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Rodriguez has failed to meet that burden here by failing to produce any evidence of the date on which the licensing charges were dismissed, or that the defendants continued to retain the tow trucks at issue after such a dismissal.  Instead, Rodriguez relies almost entirely on the lack of probable cause in the initial seizure of the property, but this court has already rejected that argument.

vehicles were confiscated in connection with his criminal charges of receiving stolen property and should have been released because they were obviously not stolen, but the trucks were actually impounded for licensing violations and this impoundment did not violate clearly established law. Thus, the officers are entitled to qualified immunity on this Fourth Amendment claim.

## V. Seizure of Rodriguez did not violate the Fourth Amendment

As to Rodriguez's seizure of person claims, the individual defendants are entitled to qualified immunity for their arrest of Rodriguez on July 7, 2006, because they had probable cause to believe that he had received stolen property.[25] The Fourth Amendment "permits an officer to arrest a suspect without a warrant if there is probable cause." *DeFillippo*, 433 U.S. at 36. The Supreme Court has consistently stated that "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 37. However, "the Fourth Amendment does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect," *United States v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002) (quoting *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998)); *see also DeFillippo*, 443 U.S. 31, 36 (stating that "the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest");

---

[25]Although the district court did not clearly discuss Rodriguez's seizure of person claims as distinct from his seizure of property claims, the defendants did address the seizure of person claims in their joint motion for summary judgment.

rather, "[p]robable cause requires only the probability of criminal activity," *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

In the instant case, the facts and circumstances within the defendants' knowledge at the time they arrested Rodriguez on July 7, 2006, warranted their belief that Rodriguez had committed a crime. Ohio law provides, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Ohio Rev. Code § 2913.51(A). Before the defendants searched M & M's premises on July 7, 2006, Detective Hall had received an anonymous tip from a former long-time M & M employee that a white dump truck on M & M's side lot was stolen. In addition to this anonymous tip, the individual defendants knew that Rodriguez had the key that unlocked the gate to the side lot where the white dump truck was, in fact, located. The truck's condition was somewhat suspicious, in that it no longer had a steering column and there were cut marks where there had once been equipment. Moreover, when the defendants ran the dump truck's VIN through their computer system, they determined that it had been reported stolen from Medina within the last six months. "For centuries courts have instructed juries that an inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods." *Barnes v. United States*, 412 U.S. 837, 843 (1975). If a jury can permissibly find guilty knowledge beyond a reasonable doubt on the basis of such an inference, then surely the defendants in this case could, on the basis of a similar inference, reasonably believe that Rodriguez had committed a crime in order to establish probable cause for his arrest. *See Criss*, 867 F.2d at 262 n.1 (citing *Draper v. United States*, 358 U.S. 307, 311-12

(1959)) (noting that "[t]he quantum of proof required to establish probable cause is significantly lower than that required to establish guilt").

Probable cause was not defeated by the fact that an M & M employee gave Detective Hall what was purportedly a receipt for the purchase of the stolen dump truck. In *Criss*, where the civil rights plaintiff had allegedly explained to the defendant arresting officers that his roommate, not he, had stolen the street signs found in their apartment, *id.* at 260-61, we determined that probable cause supported the plaintiff's arrest nonetheless, *id.* at 263. We reasoned,

> A suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making the determination whether probable cause to arrest exists. A policeman, however, is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.

*Id.* (citations omitted). Indeed, "[t]o hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" *Id.* Even if Rodriguez could prove that he had paid money for the stolen dump truck, he still could have been guilty of receiving or retaining property of another knowing that it had been stolen. After all, paying money for stolen property does not make the property any less stolen. Furthermore, the fact that the state trial court judge ultimately dismissed the charges against Rodriguez does not mean that the defendants lacked probable cause to arrest him in the first place. *See DeFillippo*, 443 U.S. at 36. Because the defendants had probable cause to arrest Rodriguez on July 7, 2006, they did not violate Rodriguez's Fourth Amendment rights, and they are therefore entitled to qualified immunity as to this claim.

The defendants also had probable cause to arrest Rodriguez on July 13, 2006. By that time, the defendants had already arrested Rodriguez once in connection with his possession of the stolen dump truck. In addition, the defendants had received a tip from the same informant, allegedly a former employee who called in the tip before the initial administrative search, that one of M & M's tow trucks had a stolen engine. Moreover, the defendants had confirmed that one of M & M's tow trucks, which had been impounded one week earlier, did in fact have an engine that had been reported stolen. These facts were sufficient to warrant the defendants' belief that Rodriguez had knowingly received stolen property, i.e., the stolen engine. Because the defendants had probable cause to arrest Rodriguez on July 13, 2006, they are entitled to qualified immunity on this claim as well.

In sum, because the defendants lawfully searched M & M's premises pursuant to C.C.O. § 601.15, because the defendants reasonably relied on facially valid local ordinances in impounding and detaining M & M's tow trucks, and because the defendants had probable cause to arrest Rodriguez on July 7 and July 13, 2006, the defendants are entitled to qualified immunity on Rodriguez's Fourth Amendment search and seizure claims.[26]

---

[26]Count IV, which alleges false arrest and false imprisonment in violation of the Fourth Amendment, overlaps with Rodriguez's claims for unreasonable seizure of person (Count I) and malicious prosecution (Count X). Accordingly, the analysis of those two claims controls the analysis of this claim. Because the individual defendants are entitled to qualified immunity on each of those two claims, the individual defendants are entitled to qualified immunity on this claim as well.

## VI. Official immunity for alleged intentional omission of exculpatory information to secure indictments

The individual defendants are absolutely immune from Rodriguez's claim of intentional omission of exculpatory information to secure indictments (Count V) because Rodriguez relies solely on Detective Hall's testimony in making this claim.[27] Though the lower court denied summary judgment on this claim, its reasoning for so holding is not entirely on point.[28] Moreover, Rodriguez's claim relies on Detective Hall's grand jury testimony and other "various testimonies" during the course of the criminal case, as opposed to his non-testimonial actions. Hall's argument for absolute witness immunity finds support in this circuit's precedent. "It is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings." *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999). This includes testimony before a grand jury, *Grant v. Hollenbach*, 870 F.2d 1135, 1139 (6th Cir. 1989), and more informal forms of testimony such as depositions and affidavits, *see Todd v. Weltman, Weinberg & Reis Co.*, 434 F.3d 432, 439-40 (6th Cir. 2006). Accordingly, because Rodriguez's intentional omission of

---

[27]The district court concluded that there are "genuine issues of material fact about whether some or all of the Defendants withheld exculpatory information in order to indict Plaintiff Rodriguez." *Rodriguez*, 619 F. Supp. 2d at 484. However, because Rodriguez only brought Count V against Detective Hall, only Detective Hall can be liable on this claim.

[28]The district court treated Rodriguez's intentional omission of exculpatory information to secure indictments claim as "identical" to Rodriguez's claim of malicious prosecution and continued unlawful detention in Count X, *Rodriguez*, 619 F. Supp. 2d at 484 n.21, but it is not clear that these claims are actually identical and the district court did not cite any authority in support of its conclusion that they are.

exculpatory information to secure indictments claim is premised on Detective Hall's testimony, Detective Hall is absolutely immune from civil liability.

Our interlocutory jurisdiction to consider Hall's claim of absolute, rather than qualified, immunity follows from *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009). In *Moldowan*, a police officer claimed an entitlement to absolute witness immunity on interlocutory appeal in a federal civil rights action. *See id.* at 371. We acknowledged in *Moldowan* that, "[u]nlike qualified immunity, the denial of a defense of absolute witness immunity generally is not immediately appealable because the 'lack of interlocutory appeal from denials of witness immunity does not imperil [a] substantial public interest.'" *Id.* at 371 (quoting *Kelly v, Great Seneca Fin. Corp.*, 447 F.3d 944, 949 (6th Cir. 2006)). Because it was a police officer who had claimed an entitlement to absolute witness immunity in *Moldowan*, however, and because that police officer had provided the disputed testimony during a criminal proceeding, we "conclude[d] that the balance of interests at issue in th[at] case differ[ed] dramatically from the interests implicated by the denial of [absolute witness] immunity in *Kelly*," where we had declined to exercise interlocutory jurisdiction. *Id.* at 371. We then explained in *Moldowan* that "the interests implicated by the district court's denial of [the police officer's] testimonial immunity claim[] are sufficiently akin to those implicated by the denial of public official immunity to support interlocutory review." *Id.* at 372. Indeed,

> [e]xposing police officers . . . to suit based on testimony they deliver as part of their official duties and on behalf of the state undoubtedly implicates their ability to exercise their discretion and potentially inhibits them from performing their duties. Unlike the parties before us in *Kelly*, "[s]ection 1983 lawsuits against police officer witnesses, like lawsuits against prosecutors, could be expected with some frequency. Police officers testify in scores of cases every year, and defendants often will

transform resentment at being convicted into allegations of perjury by the State's official witnesses."

*Id.* (alteration in original) (quoting *Briscoe v. LaHue*, 460 U.S. 325, 343 (1983)). Because we concluded in *Moldowan* that we had interlocutory jurisdiction to review a district court's denial of absolute immunity where the witness claiming that immunity was a police officer who had testified for the state in a criminal trial, we likewise have interlocutory jurisdiction to consider whether Detective Hall is entitled to absolute immunity for his testimony, and, as discussed above, he is absolutely immune from civil liability.

### VII. Qualified immunity for alleged retaliation and harassment in violation of the First Amendment

The individual defendants are entitled to qualified immunity on Rodriguez's claim alleging police retaliation and harassment for the filing of this civil lawsuit, in violation of the First Amendment, because there is no evidence in the record that any of the individual defendants participated in the allegedly harassing and retaliatory conduct. At most, the record evidence suggests that some unidentified Cleveland police detectives and police officers took the allegedly harassing and retaliatory actions—the evidence does not show that it was the individual defendants in this case. For example, Rodriguez related in an affidavit that, in August 2008, unnamed "Cleveland Police Detectives" asked Rodriguez's then-current employer about tow trucks that the employer had purchased from Rodriguez. Similarly, in February 2009, "members of the Cleveland Police Department Vehicle Inspection Unit, including but not limited to Sergeant Keith Larson," who is not a defendant in this case, instructed Rodriguez's commercial landlord not to allow Rodriguez to

remove his vehicles from a rented premises. After Rodriguez applied for a tow truck driver's

license, moreover, he "received a letter from Dorothy Michalko, from the Division of Assessments

and Licenses from the City of Cleveland"—also not a defendant in this case—disapproving his

license application without giving any reason for the disapproval. Rodriguez has put forth no

evidence to suggest that Detective Hall, Detective Davis, or Lieutenant Miller was involved in any

of these (or, for that matter, any other) allegedly harassing and retaliatory episodes.

It was, therefore, error for the district court to conclude that genuine issues of material fact

precluded summary judgment on this claim. In denying qualified immunity, the district court noted,

> The Defendants argue that they are entitled to summary judgment on this claim
> because the identities of the officers involved in the allegedly harassing and
> retaliatory activities have not been determined . . . . With this argument, the
> Defendants necessarily concede that there are genuine issues of material fact
> regarding the involvement of the Defendants in the abovementioned incidents.

*Rodriguez*, 619 F. Supp. 2d at 484. We recognize that a court of appeals ordinarily lacks jurisdiction

to consider fact-related disputes on interlocutory appeal. *Johnson*, 515 U.S. at 307, 319-20.

Specifically, "a defendant may not appeal a district court's summary judgment order insofar as that

order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.*

at 319-20. However, the Supreme Court, in *Scott v. Harris*, 550 U.S. 372 (2007), recognized a

narrow exception to this jurisdictional rule. In *Scott*, despite the district court's finding that genuine

issues of material fact precluded summary judgment on qualified immunity grounds, *id.* at 376, and

despite the court of appeals' affirming that decision after adopting the plaintiff's view of the facts

on interlocutory appeal, *id.* at 376, 378, the Supreme Court reversed, concluding that no reasonable

jury could have believed the plaintiff's side of the story, *id.* at 378-81, 386. In reaching that

conclusion, the Supreme Court relied on a videotape of the relevant events, included as part of the

record, that "blatantly contradicted" the plaintiff's version of the facts. *Id.* at 378-80. The Supreme

Court explained that, "[a]t the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Id.* at 380.

Where, as in *Scott*, the nonmoving party's "version of events is so utterly discredited by the record

that no reasonable jury could have believed him," a court of appeals "should not adopt that version

of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

In an effort to reconcile the Supreme Court's decision in *Scott* with the rule in *Johnson*, "this

Court has concluded that 'where the trial court's determination that a fact is subject to reasonable

dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory

appeal." *Moldowan*, 578 F.3d at 370 (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 853 (6th

Cir. 2008)). "However, *Scott*'s exception [to the rule in *Johnson*] applies only to the 'rare' case at

the 'outer limit' where a district court makes a 'blatan[t] and demonstrabl[e] error.'" *Landis v.

Phalen*, 297 F. App'x 400, 404 (6th Cir. 2008) (alteration in original) (quoting *Wysong*, 260 F.

App'x at 853). That is precisely the case here. Rodriguez has advanced only allegations,

unsupported by factual evidence, that Detectives Hall and Davis and Lieutenant Miller harassed and

retaliated against him. This "court's duty to view the facts in the light most favorable to the

nonmovant does not require or permit the court to accept" as true "mere allegations that are not

supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).

Moreover,

> to withstand a properly supported motion for summary judgment, plaintiff must do more than rely merely on the allegations of her pleadings or identify a "metaphysical doubt" or hypothetical "plausibility" based on a lack of evidence; she is obliged to come forward with "specific facts," based on "discovery and disclosure materials on file, and any affidavits," showing that there is a genuine dispute for trial.

*Id.* at 912 (citing Fed R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Accordingly, Rodriguez's unsupported allegations do not create a genuine issue of material fact as to the individual defendants' involvement in the allegedly harassing and retaliatory incidents. The district court's determination that the extent of the individual defendants' involvement "is subject to reasonable dispute" is, therefore, on this factual record, "blatantly and demonstrably false." *Moldowan*, 578 F.3d at 370 (quoting *Wysong*, 260 F. App'x at 853). Rodriguez has put forth no evidence whatsoever that Detectives Hall and Davis and Lieutenant Miller harassed and retaliated against him in violation of his First Amendment rights; therefore, we need not adopt his unsupported version of events. Rodriguez has not shown that Detectives Hall and Davis and Lieutenant Miller violated his First Amendment rights and they are, thus, entitled to qualified immunity on this claim.

## VIII. Qualified immunity for alleged malicious prosecution and continued unlawful detention without probable cause in violation of the Fourth Amendment

The individual defendants are entitled to qualified immunity on Rodriguez's malicious prosecution and continued unlawful detention claim. A federal malicious prosecution "claim encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*,

449 F.3d 709, 716 (6th Cir. 2006) (citing *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)). Further, "the subset of malicious prosecution claims which allege continued detention without probable cause must be pursued and analyzed under the Fourth Amendment." *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006). To prevail on such a claim, "it is clear that a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" *Thacker*, 328 F.3d at 259 (alteration in original) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 259 (6th Cir. 2001)). As discussed above, there was probable cause to arrest Rodriguez on both July 7 and July 13, 2006. Moreover, "it has been long settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.'" *Barnes*, 449 F.3d at 716 (quoting *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). Because Rodriguez "was indicted pursuant to a determination made by the grand jury, he has no basis for his constitutional claim." *Higgason*, 288 F.3d at 877. Thus, the defendants did not violate Rodriguez's rights in prosecuting or detaining him and they are, therefore, entitled to qualified immunity.

### IX. Qualified immunity on alleged supervisory liability of Lieutenant Miller for Fourth Amendment violations

Lieutenant Miller is entitled to qualified immunity on Rodriguez's supervisory liability for Fourth Amendment violations claim because that claim is premised on the search of M & M, Rodriguez's two arrests, and the seizure of his property, all of which comported with the Fourth Amendment. Because Rodriguez brought this supervisory liability claim against Lieutenant Miller only, neither Detective Hall nor Detective Davis can be held liable under the theory of supervisory

liability—there are no such allegations pending against them. A theory of supervisory liability requires a civil rights plaintiff to demonstrate more than a supervisor's mere passivity in the face of a subordinate's alleged unconstitutional action. Indeed, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act,'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998)), or the "mere right to control employees," *Gregory*, 444 F.3d at 751. Since there was no unconstitutional behavior on the part of either Lieutenant Miller or his subordinates, however, in effecting Rodriguez's arrests and the seizures of his property, Lieutenant Miller is entitled to qualified immunity on this claim.

## X. Palmer's untimely civil rights action

This court has jurisdiction to entertain Plaintiff/Cross-Appellant Palmer's appeal because the district court's grant of summary judgment for defendants on her claims is an appealable final judgment. Although Palmer filed her notice of appeal before the district court had entered a Federal Rule of Civil Procedure 54(b) certification, the district court did eventually enter such a certification. Indeed, on March 8, 2010, the district court issued this order: "Because there is 'no just reason for delay[ing]' Palmer's appeal of [the district court's May 26, 2009,] order, the Court directs the entry of judgment accordingly under Rule 54(b)." Rule 54(b), in turn, provides,

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

This court has previously "h[e]ld that a premature notice of appeal ripens upon the entry of a proper Rule 54(b) certification, regardless of whether the certification is entered *nunc pro tunc*." *Good v. Ohio Edison Co.*, 104 F.3d 93, 95 (6th Cir. 1997). Accordingly, the district court's grant of summary judgment for defendants on Palmer's claims is an appealable final judgment and this court has jurisdiction over Palmer's appeal pursuant to 28 U.S.C. § 1291.

The district court properly granted summary judgment, on statute of limitations grounds, on Palmer's Fourth Amendment seizure of property claim. This court reviews a district court's dismissal on statute of limitations grounds de novo. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003). "Actions brought pursuant to 42 U.S.C. § 1983 apply the statute of limitations from a state's general personal injury statute." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003). Thus, for 42 U.S.C. § 1983 actions brought in Ohio, a two-year statute of limitations applies. *Id.* at 855-56 (citing Ohio Rev. Code § 2305.10). This two-year "statute of limitations begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action." *McCune v. Grand Rapids*, 842 F.2d 903, 905 (6th Cir. 1988). A plaintiff, moreover, "has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id.*

Although Palmer learned in July 2006 that M & M's property had been seized, she did not file a complaint in federal district court until October 14, 2008. The seizure of M & M's property provides the basis for Palmer's Fourth Amendment seizure of property claim. Because Palmer did not bring her Fourth Amendment seizure of property claim within two years of when she learned that

the property had been seized, the district court properly granted summary judgment for defendants

on statute of limitations grounds.

The district court properly granted summary judgment for defendants on Palmer's malicious

prosecution claim, as well. The malicious prosecution claim also relies on the seizure of M & M's

property as the basis for Palmer's constitutional injury; thus, that claim is also untimely.

## XI. Conclusion

For the foregoing reasons, the individual defendants are entitled to qualified immunity with

respect to the claims in the Rodriguez action. We therefore reverse and remand for further

proceedings consistent with this opinion. We affirm, however, the district court's grant of summary

judgment as to Palmer's claims on statute of limitations grounds.

**HELENE N. WHITE, Circuit Judge** (concurring in part, dissenting in part). I agree with the majority that we have interlocutory jurisdiction to consider whether Detective Hall is entitled to absolute immunity as to plaintiff Rodriguez's claim that he intentionally omitted exculpatory evidence to secure indictments, that Hall was entitled to absolute immunity, and that the claim was thus properly dismissed. I also agree that plaintiff Palmer's claims were properly dismissed.

I respectfully dissent from the majority's determination that the individual defendants are entitled to qualified immunity as to Rodriguez's claims of retaliation and harassment under the First Amendment. I cannot agree with the majority that the district court's determination that genuine issues of fact precluded summary judgment of the First Amendment retaliation and harassment claims was "blatantly and demonstrably false."

The record supports the district court's determination. Specifically, Rodriguez's third amended complaint alleged that in August 2008 (after the case against him had been dismissed by the Cuyahoga County Common Pleas Court) officers in the Cleveland Police Department's (CPD) *auto theft unit* visited and questioned the owner of another towing company regarding trucks Rodriguez formerly owned, and the officers told the towing company owner not to tell Rodriguez they had been there and questioned him. Rodriguez's third amended complaint also alleged other retaliation and harassment by the CPD in the spring of 2008 and in later 2008. Defendants' motion for summary judgment stated (as does the district court's opinion at n.3, R. 156 at 3) that in July 2006, the CPD's *auto theft unit* consisted of *four officers*, three of whom are individual defendants in this case, Miller, Hall, Davis. R. 117 at 15. Defendants' deposition testimony and affidavits establish that Hall and Davis remained in the auto theft unit in August 2008. R. 117-5, ¶ 2 (Hall

sworn declaration); R. 85-1 at 6 (Davis dep.); R.85-5 at 12-13, 25 (Miller dep.) Thus, in 2008, two of the four individual defendants were in the auto theft unit, a unit that apparently is generally comprised of four officers.

Under these circumstances, the district court's determination that genuine issues of material fact remained regarding the individual defendants' involvement in the alleged retaliation and harassment during 2008 was not "palpably and demonstrably false."

Nor do I agree that the individual defendants are entitled to qualified immunity as to Rodriguez's malicious prosecution and continued unlawful detention without probable cause under the Fourth Amendment. Because the district court properly determined that genuine issues of material fact precluded granting summary judgment on these claims, this court cannot, on interlocutory appeal, review those determinations. *Johnson v. Jones*, 515 U.S. 307, 319-20 (1995) (holding that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial"), *Bomar v. City of Pontiac*, 643 F.3d 458, 461 (6th Cir. 2011) (citing *Johnson*, 515 U.S. at 317.)

I also respectfully dissent from the majority's determination that the individual defendants are entitled to qualified immunity on Rodriguez's claims of unreasonable search and seizure under the Fourth Amendment (Count I), and would affirm the district court's grant of his motion for partial summary judgment, as explained below.

Finally, given that there was an underlying constitutional violation of Rodriguez's rights, I respectfully dissent from the majority's determination that defendants City of Cleveland and Police

Chief McGrath are entitled to summary judgment as to Rodriguez's claim of municipal liability, i.e., that defendant City, or the Cleveland Police Department, headed by defendant McGrath, had a well-established custom or practice of using administrative inspections of regulated businesses as a pretext or guise to gather evidence of criminal activity without obtaining a warrant, and the related claims of failure to train, investigate and discipline. The district court properly determined that genuine issues of fact precluded summary judgment of these claims.

## I

Warrantless inspections of commercial sites that are part of a pervasively regulated industry may be constitutionally permissible if they meet the three-prong test of *New York v. Burger*, 482 U.S. 691, 700 (1987):

> Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context . . . . [W]e conclude that, as in other situations of special need, where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises *may well be* reasonable within the meaning of the Fourth Amendment.
>
> This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made . . . . Second, the warrantless inspections must be necessary to further the regulatory scheme. . . . Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made

pursuant to the law and has a properly defined scope, and it must limit the discretion
of the inspecting officers.

482 U.S. at 702 (citations and quotations omitted, emphasis added). *See also United States v.*

*Branson*, 21 F.3d 113, 116 (6th Cir. 1994) (*citing Burger*, 482 U.S. at 702).

In upholding the constitutionality of a warrantless administrative inspection of an automobile

junkyard business, the *Burger* Court observed that it was undisputed that the inspection was made

*solely* pursuant to the administrative regulation and that the inspection did not appear to be a pretext

for obtaining evidence of criminal wrongdoing:

> The legislative history of [the administrative inspection regulation] . . . reveals that
> the New York Legislature had proper regulatory purposes for enacting the
> administrative scheme and was not using it as a "pretext" to enable law enforcement
> authorities to gather evidence of penal violations. . . . There is, furthermore, *no*
> *reason to believe that the instant inspection was actually a "pretext" for obtaining*
> *evidence of respondent's violation of the penal laws*. It is undisputed that the
> inspection was made *solely* pursuant to the administrative scheme.

*Burger*, 482 U.S. at 716 n.27 (emphasis added). *Burger* makes clear beyond peradventure that "[t]he

discovery of evidence of crimes *in the course of an otherwise proper administrative inspection* does

not render that search illegal." *Anobile v. Pelligrino*, 303 F.3d 107, 122 (2d Cir. 2002) (quoting

*Burger*, 482 U.S. at 716) (emphasis added). *See also United States v. Johnson*, 408 F.3d 1313, 1321

(10th Cir. 2005), *cert. denied*, 546 U.S. 951 (2005) (noting that *Burger* "did not endorse a scheme

that would allow a warrantless search based on recently discovered evidence that criminal activity

had occurred," and that inspections of business premises "conducted not as part of a pre-planned and

dispassionate administrative procedure but instead pursuant to *direct criminal suspicion* give cause

for grave constitutional concern.") (citations and internal quotations omitted, emphasis added).

## A

I cannot agree with the majority that the individual defendants' administrative search fell within the confines of the Fourth Amendment. The majority overlooks that *Burger* and its progeny make clear that where, as in the instant case, officials conduct an administrative inspection based solely on their direct criminal suspicion, the search is invalid from its inception. The cases the majority relies neither overrule nor contravene this long-standing proposition.

*United States v. Villamonte-Marquez*, 462 U.S. 579 (1983), on which the majority relies to support its determination that "defendants' pre-search suspicion that Rodriguez possessed a stolen dump truck"[29] did not render their warrantless administrative search invalid, is distinguishable from the instant case because it did not involve an administrative inspection prompted solely by *direct criminal* suspicion of criminal wrongdoing.

In *Villamonte-Marquez*, customs officers and Louisiana state policemen were patrolling a ship channel, apparently at least in part because of a tip that a vessel in the channel was carrying marijuana. 462 U.S. at 582, 584 n.3. The officers sighted an anchored 40-foot sailboat in the channel, and approached it after witnessing it rock violently in the wake of a passing large freighter. *Id.* at 582. The officers twice asked the lone man on deck if the sailboat and crew were all right, and the man unresponsively shrugged his shoulders. Pursuant to Customs laws permitting suspicionless boarding of vessels to examine the manifest and other documents, the officers boarded the sailboat and asked to see the vessel's documentation. *Id.* at 583-85. While examining the document, an

---

[29]Maj. Op. at 17.

officer smelled what he thought to be burning marijuana and observed burlap-wrapped bales through

an open hatch. Villamonte-Marquez was laying atop the bales on a sleeping bag. The officer

arrested both the man on deck and Villamonte-Marquez, and a subsequent search revealed thousands

of pounds of marijuana, including in the burlap-wrapped bales. *Id.* at 583.

The Court of Appeals for the Fifth Circuit reversed the defendants' convictions of drug-

related charges, finding that the officers' boarding of the sailboat was not reasonable under the

Fourth Amendment because the boarding occurred absent reasonable suspicion of a violation of law.

*Id.* The Supreme Court granted certiorari and reversed, holding that the officers' *suspicionless*

boarding of the sailboat was reasonable and thus consistent with the Fourth Amendment. The Court

noted that while random stops of vehicles without articulable suspicion of unlawful conduct are

impermissible, the nature of waterborne commerce in waters providing ready access to the open sea

is sufficiently different from vehicular traffic on highways so that alternatives to the sort of stop

made here would be less likely to accomplish the essential governmental purposes involved. *Id.* at

592-93. In a footnote, the *Villamonte-Marquez* Court stated:

> There is no issue in this case concerning the activities of the officers once they boarded the *Henry Morgan II*. The only question presented to this Court concerns the validity of the *suspicionless* boarding of the vessel for a document inspection.
>
> Respondents, however, contend in the alternative that because the Customs officers were accompanied by a Louisiana State Policeman, and were following an informant's tip that *a vessel* in the ship channel was thought to be carrying marijuana, they may not rely on the statute authorizing boarding for inspection of the vessel's documentation. This line of reasoning was rejected in a similar situation in *Scott v. United States*, 436 U.S. 128, 135-139 [] (1978), and we again reject it. Acceptance of respondent's argument would lead to the incongruous result criticized by Judge Campbell in his opinion in *United States v. Arra*, 630 F.2d 836, 846 ([1st Cir.] 1980):

> "We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers."

462 U.S. at 584 n.3 (emphasis added).

The informant's tip in *Villamonte-Marquez* bears no resemblance to the tip relaying specific criminal wrongdoing by Rodriguez; rather, it relayed that a vessel in the ship channel, not the particular sailboat boarded and searched, was *thought* to be carrying marijuana. Thus, the Supreme Court characterized as "suspicionless" the officers' boarding of the sailboat in *Villamonte-Marquez*. Clearly, the marijuana seized in *Villamonte-Marquez* was discovered *during the course of* the document inspection, following the officers' boarding of the sailboat to conduct a document inspection. In contrast, in the instant case, the allegedly stolen white truck at M&M was discovered during the course of an inspection prompted solely by a tip that relayed specific criminal wrongdoing by Rodriguez, i.e., that he possessed the stolen white truck. Dist. Ct. Op. at 3; R. 156 at 3.

## B

Similarly, the remaining cases the majority relies on, like *Villamonte-Marquez* and unlike the instant case, did not involve direct criminal suspicion of wrongdoing and are thus also distinguishable. In *Bruce v. Beary*, 498 F.3d 1232, 1235-36 (11th Cir. 2007), a customer of Bruce's auto body repair shop and salvage yard complained to an officer of the county auto-theft unit that he had purchased a car from Bruce at Bruce's place of business, and that the vehicle identification number (VIN) plate did not match the confidential VIN sticker on the car. Officers decided to conduct an administrative inspection of the premises, pursuant to a Florida statute. Numerous officers surrounded the premises, entered with guns drawn, searched the employees and offices, and

inspected more than 150 vehicles. Officers found what appeared to be a counterfeit VIN plate in

Bruce's briefcase, and several vehicles that had been reported stolen or were missing, or had altered,

VIN plates. Shortly after, Bruce was arrested and charged with possession of loose VIN plates, and

operating a chop shop. *Id.* at 1237. A few hours later, the officers obtained a search warrant and

then seized files, office equipment, and over 100 vehicle titles and registrations. *Id.* at 1238.

Bruce brought suit under 42 U.S.C. § 1983, alleging that the administrative inspection

violated the Fourth Amendment. The district court granted summary judgment to all the defendants,

holding that there had been no constitutional violations. On appeal, Bruce argued

> that an administrative inspection, pursuant to an authorizing statute, must be a
> routine, random, suspicionless visit to a business to inspect books and records. He
> asserts that any time law enforcement has "particularized suspicion" of illegal
> activity at a business and seeks to investigate and gather evidence, it must arrive
> warrant in hand.
>
> Bruce relies heavily on the Supreme Court's 2000 decision in [*United States
> v.*] *Edmond*, [531 U.S. 32 (2000),] in which the Court consistently uses the term
> "suspicionless searches" to characterize administrative searches. 531 U.S. at 37 [].
> ("we have upheld brief, suspicionless seizures"). The Court in *Edmond* struck down
> a drug-interdiction checkpoint because its primary purpose was the detection of
> "ordinary criminal wrongdoing." *Id.* at 41 []. The Court said that "when government
> seeks to ferret out crime, it is expected to comply with the Fourth Amendment." *Id.*
>
> Furthermore, the Tenth Circuit's recent decision in *United States v. Johnson*,
> 408 F.3d 1313, 1321 (10th Cir. 2005), supports Bruce's view. In *Johnson*, the Tenth
> Circuit stated that when the "evidence of criminal activity [is] so compelling that
> police have, in essence, probable cause to believe that specific criminal conduct has
> occurred," they must get a warrant. *Id.* This is so, the court said, because *Burger* did
> not endorse a scheme that would allow a warrantless search based on recently
> discovered evidence that criminal activity had occurred. *Id.* Furthermore, the court
> said, inspections of business premises conducted not as part of a pre-planned and
> dispassionate administrative procedure but instead *pursuant to direct criminal
> suspicion* give cause for grave constitutional concern. *Id.*

The Eighth Circuit has also recognized the danger of allowing administrative searches to become "pretexts for 'crime control.'" *United States v. Knight*, 306 F.3d 534, 537 (8th Cir. 2002) (holding unconstitutional the administrative search of personal belongings conducted in that case).

We share our sister circuits' concern that the administrative exception not be allowed to swallow the whole Fourth Amendment. *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 998 (11th Cir. 1995) ("Even in the context of administrative searches of business property, however, the Fourth Amendment limits warrantless searches"). *Unless the warrant exception for administrative inspections of pervasively regulated businesses means that under no circumstances is law enforcement required to secure a warrant prior to entry, at some level of suspicion a warrant is required.* In this era of pervasive regulation of most businesses, to interpret the exception otherwise might well give cause for general alarm.

We need not, however, address today the question of where to draw that line because we hold that under the circumstances of this case the officers did not cross it. The Supreme Court has made quite clear that an administrative search is not rendered invalid because it is accompanied by *some suspicion* of wrongdoing. In *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 [] (1983), the Court approved an administrative search that was prompted by an informant's tip that a vessel was carrying marijuana, noting that there was "little logic in sanctioning . . . examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers" (quoting *United States v. Arra*, 630 F.2d 836, 846 (1st Cir. 1980)).

We too have approved administrative searches in response to information giving rise to some suspicion of illegal activity. *Crosby v. Paulk*, 187 F.3d 1339, 1348 and n.12 (11th Cir. 1999). In *Crosby*, officers conducted the administrative inspection of a nightclub as part of an ongoing criminal investigation into underage drinking and other alcohol violations. *Id.* at 1342. *See also United States v. Thomas*, 973 F.2d 1152, 1155-56 (5th Cir. 1992) (administrative searches do not violate Constitution simply because of the existence of specific suspicion of wrongdoing); *United States v. Nechy*, 827 F.2d 1161, 1167 (7th Cir. 1987); *Arra*, 630 F.2d at 846.

Even in *Johnson*, in which the Tenth Circuit cautioned against administrative searches in the service of particularized suspicion, the court upheld the warrantless search at issue in the case, concluding that the officers did not have "direct criminal suspicion" of wrongdoing. 408 F.3d at 1321.

> Similarly, in this case, the officers did not have "direct criminal suspicion" of wrongdoing. *They received a criminal complaint regarding possible VIN violations at Bruce's auto body shop.* This information alone did not rise to the level of probable cause that would have supported application for a warrant. *In the absence of such direct criminal suspicion*, the officers validly invoked their statutory authority to inspect Bruce's Premises to determine whether he was operating in accordance with Florida law governing use of VIN plates. Merely because the officers had "an objectively reasonable basis to suspect they might find stolen cars or car parts in their inspection does not invalidate that inspection." *Id.* at 1323. Therefore, we hold that defendants were permitted to conduct a warrantless administrative inspection of Bruce's Premises for the purpose of investigating VIN violations.

*Bruce*, 498 F.3d at 1241-42 (some citations and quotations omitted, emphasis added).

Just as *Bruce* acknowledges that the administrative inspection at issue there was valid given the absence of direct criminal suspicion, so does another case on which the majority relies, *United States v. Johnson*, 408 F.3d 1313, 1321-22 (10th Cir. 2005) (upholding administrative inspection where officers did not have direct criminal suspicion regarding the auto salvage shop or its employee, Johnson, but rather had "a vague suspicion that the kind of criminal activity the administrative scheme was directed towards detecting – car theft – had occurred or might be evident at the salvage yard where Johnson worked.")

Another case the majority relies on is *United States v. Thomas*, 973 F.2d 1152, 1156 (5th Cir. 1992), in which the defendant appealed his conviction of illegal activities involving alteration of VIN numbers. Texas had a Department of Public Safety (DPS) pilot program of documenting salvage vehicles that were not economically feasible to rebuild. The program's purpose was to uncover illegal salvage-switch or VIN-switch operations. Under such schemes, the VIN from the salvage vehicle is switched to a stolen car, which is then sold under the guise of rebuilt salvage.

After tracking a salvage vehicle to the defendant's auto salvage business, a DPS investigator conducted an inventory inspection, during which he seized a vehicle and VIN plates, which provided the information needed to secure a search warrant of the defendant's residence, at which VIN plates were found. *Id.* at 1155.

Unlike the instant case, there is no indication that the salvage vehicle's mere presence at Thomas's auto salvage business was illegal. The Fifth Circuit found meritless the defendant's argument that the search violated the Fourth Amendment "because it was not part of a scheme of periodic and frequent inspections, but rather, was targeted at gathering information concerning specific vehicles." *Id.* Although the Fifth Circuit cited *Villamonte-Marquez* for the proposition that "specific suspicion of wrongdoing" will not invalidate an administrative inspection, 973 F.2d 1155-56, the facts and holding in *Thomas* are in keeping with the distinction articulated since *Burger* between generalized or vague suspicion of wrongdoing and *direct criminal suspicion*.

Another Fifth Circuit case the majority cites, *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 197-98 (5th Cir. 2009) quotes from *Burger*, 482 U.S. at 724: "In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations."

## C

Since *Burger*, the Supreme Court has reiterated that where a warrantless administrative inspection of a closely-regulated business is conducted for the sole purpose of criminal investigation, the search is invalid. In *Whren v. United States*, 517 U.S. 806 (1996), the Court remarked:

> We are reminded that in *Florida v. Wells*, 495 U.S. 1, 4 [] (1990), we stated that "an inventory search" must not be a ruse for a general rummaging in order to discover incriminating evidence"; that in *Colorado v. Bertine*, 479 U.S. 367, 372 [] (1987), in approving an inventory search, we apparently thought it significant that there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"; and that in *New York v. Burger*, 482 U.S. 691, 716-717, n.27 [] (1987), we observed, in upholding the constitutionality of a warrantless administrative inspection, that the search did not appear to be "a 'pretext' for obtaining evidence of . . . violation of . . . penal laws." But only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the *absence* of probable cause. Our quoted statements simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches *made for the purpose of inventory or administrative regulation*, is not accorded to searches that are *not* made for those purposes. *See Bertine*, *supra*, at 371-372 []; *Burger, supra*, at 702-703 [].
> . . . .
> [W]e never held, *outside the context of inventory search or administrative inspection* . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment . . .

*Whren*, 517 U.S. at 811-12 (some emphasis added). And in *Ashcroft v. al-Kidd*, 131 S. Ct. 2074

(2011), the Court reiterated in discussing qualified immunity that a warrant and probable cause are

not needed for an administrative inspection of a closely-regulated business provided that the officer's

purpose was to "attend to the investigation for which the administrative inspection is justified":

> Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether "the circumstances, viewed objectively, justify [the challenged] action." If so, that action was reasonable "*whatever* the subjective intent" motivating the relevant officials. *Whren v. United States*, 517 U.S. 806, 814 [] (1996). This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts; and it promotes evenhanded, uniform enforcement of the law.
>
> *Two limited exceptions to this rule are our special-needs and administrative-search cases, where "actual motivations" do matter.* A judicial warrant and probable cause are not needed where the search or seizure is justified by special needs, beyond the normal need for law enforcement, such as the need to deter drug

- 55 -

use in public schools, or the need to assure that railroad employees engaged in train operations are not under the influence of drugs or alcohol; and where the search or seizure is in execution of an administrative warrant authorizing, for example, an inspection of fire-damaged premises to determine the cause, or an inspection of residential premises to assure compliance with a housing code. *But those exceptions do not apply where the officer's purpose is not to attend to the special needs or to the investigation for which the administrative inspection is justified. See Whren*, [517 U.S.] at 811-812 [] . . . .

Apart from those cases, we have almost uniformly rejected invitations to probe subjective intent . . . .

*Al-Kidd*, 131 S. Ct. 2080-81 (some citations and internal quotations omitted, some emphasis added.)

**D**

I agree with the district court that Defendants' July 7 and 13, 2006 searches of M&M, and seizures of Rodriguez and property from M&M, prompted solely by their direct suspicion of Rodriguez's criminal wrongdoing, were unreasonable under the Fourth Amendment,[30] *Burger*, 482 U.S. at 716 n.27; *Whren*, 517 U.S. at 811-12, and that Rodriguez thus satisfied the first prong of the qualified immunity test. *See Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

The second prong of qualified immunity is that the constitutional right violated was clearly established at the time of defendants' misconduct. *Al-Kidd*, 131 S. Ct. at 2080, *Feathers*, 319 F.3d at 848. The prohibition on warrantless administrative inspections prompted solely by officials' direct criminal suspicion, announced in *Burger* in 1987, has been consistently rearticulated by the Supreme Court thereafter. *See Whren*, 517 U.S. at 811-12 (and cases cited therein), *al-Kidd*, 131 S. Ct. at 2080-81.

---

[30]Dist. Ct. Op./R. 156 at 21-22.

Given that the inspection of M&M was unlawful from its inception, nothing discovered in the ensuing search could be used to support the required probable cause to seize property or arrest Rodriguez. *See Bruce*, 498 F.3d at 1248 (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

I would affirm the district court's grant of partial summary judgment to Rodriguez on his claims that defendants' searches and seizures violated the Fourth Amendment.